**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| Bank of Louisiana, individually and on behalf of all similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>Marriott International, Inc.,<br><br>Defendant. | No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Bank of Louisiana ("Plaintiff"), by its undersigned counsel, brings this action on behalf of itself and a class of all similarly situated financial institutions and other entities against Defendant Marriott International, Inc. ("Defendant" or "Marriott").  Plaintiff bases the forgoing allegations upon personal information and belief, the investigation of counsel, and states the following:

**<u>INTRODUCTION</u>**

1.      This action arises out of the data breach announced by Marriott on November 30, 2018 that compromised personal and financial data of approximately 500 million individuals (the "Marriott Data Breach").  From 2014 to September 10, 2018, customer data on Marriott's Starwood Hotel brand's guest reservation database (the "Starwood Database") was exposed by and available to hackers, resulting in one of the longest-running and largest data breaches in history.

2.      As a result of the Marriott Data Breach, approximately 500 million users of the Starwood Database had their name, mailing address, phone number, email address, passport number, Starwood Preferred Guest ("SPG") account information, date of birth, gender, arrival and

departure information, reservation date, and communication preferences compromised.   The exposed information also included financial information in the form of payment card numbers and payment card expiration dates.

3.      Payment card information is highly sought-after by hackers.   With such information, hackers are able to make fraudulent purchases on unsuspecting victims' accounts, often leaving financial institutions holding the bag for fraudulent purchases as well as incurring additional costs to monitor compromised accounts and replace compromised cards.

4.      The hospitality sector is known to be a popular target for hackers.   Massive data breaches have occurred at several hotel chains, including Hilton Hotels, Hyatt Hotels, InterContinental Hotels Group, Wyndham Worldwide, Radisson Hotel Group, and Starwood Hotel Group.   These targets are particularly rich in data that hackers find valuable as the data contains a trove of information that can be used to impersonate individuals and perpetrate fraudulent transactions in their name.

5.      Data security has become a necessary part of 21st-century business.   In light of the well-known risks associated with data breaches, the Payment Card Industry Security Standards Council ("PCI SSC") was formed to help businesses detect, mitigate, and prevent cyberattacks and breaches.   The PCI SSC's founding members—American Express, Discover Financial Services, JCB International, MasterCard, and Visa, Inc.—have established working relationships with industry associations around the country, including the American Hotel and Lodging Association, to develop security standards and programs that secure payment card data.   Marriott is a "Participating         Organization"         in         the         PCI         SSC.         *See* https://www.pcisecuritystandards.org/get_involved/participating_organizations?category=&region=&alphaFilter=m#filterForm (last accessed December 3, 2018).

6.      The PCI SSC has issued standards mandating merchants to meet certain minimum data security requirements.  Additionally, the Federal Trade Commission ("FTC") issued guidance and resources for businesses to advance their data security.

7.      Despite the value of the data that Marriott stored, the well-known risks of a data breach, and the PCI Data Security Standards ("PCI DSS") and FTC guidelines, Marriott failed to adequately protect its customers' personal and financial information.

8.      Beginning in 2014, hackers gained access to the Starwood Database.

9.      Marriott did not become aware of the Marriott Data Breach until September 8, 2018, when it received an alert from an internal security tool regarding an attempt to access the Starwood Database.  An ensuing investigation revealed that an unauthorized party had copied and encrypted information and took steps towards removing it.

10.     Although Marriott was alerted to the breach in early September, it was not able to decrypt the breached information to determine its contents until November 19, 2018.  During the intervening time, Marriott made no public announcements about the breach and provided no information to financial institutions that issue potentially compromised payment cards.

11.     Marriott still would not announce the breach to the public until November 20, 2018, another 11 days later.

12.     Marriott asserted it was still assessing the scope of the breach, but acknowledged that payment card data was compromised.  It further stated that payment card numbers were encrypted, and two components were needed to decrypt the payment card numbers, but it could not rule out the possibility that both components were taken in this breach.

13.     On December 7, 2018, Visa issued a Compromised Account Management System (CAMS) alert warning that financial card information had been compromised as a result of the Marriott Data Breach.

14.     The Marriott Data Breach was the inevitable result of Marriott's inadequate data security measures.  Despite the well-publicized and ever-growing threat of data breaches involving payment card systems and databases, Marriott failed to ensure that it maintained adequate data security measures that could have detected and prevented the breach.

15.     In addition to failing to detect or prevent the intrusion and failing to implement data security measures that would have limited the effect of a breach on the financial institutions who issue payment cards, Marriott exacerbated the injury by failing to notify issuers or the payment card industry of the infiltration when it supposedly learned of the breach in September.

16.     Had Marriott implemented reasonable data security processes and procedures— measures known and recommended by the payment card industry, the Federal Trade Commission, and data security experts—Marriott could have reasonably prevented the breach of its systems, or minimized the scope and impact.

17.     The Marriott Data Breach caused substantial injury to financial institutions who issued cards affected by the data breach, including, but not limited to, costs to:

      a.  cancel or reissue credit and debit cards affected by the Marriott Data Breach;

      b.  close deposit, transaction, checking, or other accounts affected by the Marriott Data Breach, including, but not limited to, stopping payments or blocking transactions with respect to the accounts;

    c.  open or reopen any deposit, transaction, checking, or other accounts affected by the Marriott Data Breach;

    d.  refund or credit any cardholder to cover the cost of any unauthorized transaction relating to the Marriott Data Breach;

    e.  respond to a higher volume of cardholder complaints, confusion, and concern; and

    f.  increase fraud monitoring efforts.

18.    The injuries to Plaintiff and the Class were directly and proximately caused by Marriott's failure to implement and maintain adequate data security measures for customer information, including credit and debit card data and personal identifying information ("PII").

19.    Marriot failed to take steps to employ adequate security measures despite well-publicized data breaches at large national hotel chains in recent years, including Hilton Hotels, Hyatt Hotels, InterContinental Hotels Group, Wyndham Worldwide, Radisson Hotel Group, and Starwood Hotel Group.

20.    Plaintiff seeks, for itself and a class of similarly situated payment card issuing financial institutions, to recover the costs that they have been forced to bear as a direct result of the Marriott Data Breach.  Plaintiff also seeks to obtain appropriate equitable relief.

## JURISDICTION AND VENUE

21.    This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, Marriott is a citizen of a State different from that of at least one Class member, and there are more than 100 putative class members.  This Court also

has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

22.    This Court has personal jurisdiction over Marriott International, Inc., because the company maintains its principal place of business in Maryland, regularly conducts business in Maryland and has sufficient minimum contacts in Maryland.  Marriott intentionally avails itself of this jurisdiction by marketing and selling Starwood Hotel brand's services and managing companywide affairs in Maryland.

23.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) through (d) because Defendant's principal place of business is located in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

24.    Defendant Marriott International, Inc., is a Delaware corporation with its principal place of business located at 10400 Fernwood Road, Bethesda, Maryland 20817.  Marriott owns and operates the Starwood Database and is responsible for maintaining adequate data security measures over information stored on the Starwood Database, including consumers' payment card information.

25.    Plaintiff Bank of Louisiana is an FDIC-insured bank.  Its principal place of business is located at 300 St. Charles Ave., New Orleans, LA 70130.  Plaintiff has five branches located in Orleans, Jefferson, and St. Tammany Parish, as well as in Lupalco and Pontchartrain.  Plaintiff has issued VISA payment cards and received alerts that some the cards it issued were compromised by the Marriott Data Breach.  As a result of Marriott's failure to adequately protect its data systems, Plaintiff has suffered, and continues to suffer injury, including, but not limited to costs for card reissuance and administrative and operational costs in responding to the Marriott Data Breach.

## FACTS

26.     On September 23, 2016, Marriott announced that it completed the acquisition of Starwood Hotels & Resorts Worldwide, LLC ("Starwood"), creating the world's largest hotel company.  *See* http://news.marriott.com/2016/09/marriotts-acquisition-of-starwood-complete/.

27.     Under the terms of the merger agreement, Marriott acquired all Starwood Hotel brands, including W Hotels, St. Regis, Sheraton Hotels & Resorts, Westin Hotels & Resorts, Element Hotels, Aloft Hotels, The Luxury Collection, Tribute Portfolio, Le Méridien Hotels & Resorts, Four Points by Sheraton and Design Hotels.  Starwood-branded timeshare properties were also included in the acquisition.

28.     Along with the hotels, Marriott also acquired Starwood's reservation service (i.e. the Starwood Database), which stored the names, mailing addresses, phone numbers, email addresses, passport numbers,  date of birth, gender, arrival and departure information, reservation date, and payment card information for guests  who made reservations at hotels belonging to the Starwood group.  Guests were able, and in most instances, Defendant required Guests, to store financial card information on the Starwood Database.  This enabled Marriott to obtain payment, impose cancellation charges, and to track guests and their reservations.

29.     Since the 2016 merger, Marriott has continued to use the Starwood Database to track a multitude of guests and myriad information about each guest.

30.     Marriott did not take adequate steps to ensure that the information stored on the Starwood Database would be safeguarded from unwanted intrusion.

31.     On September 8, 2018, Marriott received an alert from an internal security tool regarding an attempt to access the Starwood Database.   After engaging security experts to

determine the cause of the intrusion, Marriott discovered that there had been unauthorized access to the Starwood Database since 2014.

32.     On November 30, 2018, Defendant announced that the Starwood Database had been hacked, exposing personal and financial information of approximately 500 million guests.

33.     The compromised information included some combination of name, mailing address, phone number, email address, passport number, SPG account information, date of birth, gender, arrival and departure information, reservation date, and communication preferences of guests who made reservations at hotels belonging to the Starwood group.  It also included payment card numbers and payment card expiration dates.  See https://answers.kroll.com/ (last accessed Dec. 10, 2018).

**Marriott Knew the Importance of Maintaining Adequate Data Security**

34.     Marriott was well aware of the likelihood and repercussions of cybersecurity threats, including data breaches, having observed numerous other well-publicized data breaches involving major corporations—including many hotel chains—over the last five years.

35.     Marriott also made representations to consumers regarding its data privacy practices.  Marriott's "Global Privacy Statement" on data security reads: "We use reasonable physical, electronic, and administrative safeguards to protect your Personal Data from loss, misuse and unauthorized access, disclosure, alteration and destruction, taking into account the nature of the Personal Data and the risks involved in processing that information."  *See* https://www.marriott.com/about/global-privacy.mi (last accessed Nov. 30, 2018).

36.     Marriott's Privacy Policy also stated that Marriott "limit[s] the collection and use of Personal Data to the information that is relevant for the purposes of processing and will not process Personal Data in a way that is incompatible with the purposes for which the information

has been collected or subsequently authorized by you.  We take reasonable steps to ensure the Personal Data is reliable for its intended use, accurate, complete, and current to the extent necessary for the purposes for which we use the Personal Data." *Id.*

37.    Marriott's awareness of the importance of data security was bolstered in part by its knowledge of numerous other well-publicized data breaches involving major corporations being targeted for consumer information in the years preceding the Marriott Data Breach.

38.    In 2013 and 2014, hackers accessed Target and Home Depot and obtained the payment card information for tens of customers of those companies.

39.    In succeeding years, hackers have accessed and stolen payment card information for millions of payment cards from Starwood, Hyatt, InerContinental Hotel Group, K-Mart, Wendy's, Arby's, Eddie Bauer, Chipotle, Noodles & Company, and a host of other consumer retail and hospitality companies.

40.    In summer 2014, JP Morgan Chase was breached, compromising the data of 76 million American households and 7 million small businesses.

41.    In early 2015, Anthem, the second-largest health insurer in the United States, suffered a data breach that exposed the names, addresses, Social Security numbers, dates of birth, and employment histories of nearly 80 million current and former plan members.

42.    In September 2015, credit reporting agency Experian acknowledged that an unauthorized party accessed one of its servers containing the names, addresses, Social Security numbers, dates of birth, driver's license, military ID, and/or passport numbers, and additional information of more than 15 million consumers over a period of two years.

43.    In 2017, Equifax announced that hackers stole personal and financial information of nearly 150 million Americans over a two-and-a-half-month period.

**Industry and Federal Standards Reduce the Risk of Data Breaches**

44.     Data breaches such as these spurred the PCI SSC, data security organizations, state governments, and federal agencies to create security measures and business practices aimed at significantly reducing the likelihood that hackers could successfully infiltrate businesses' secure networks and limit their effectiveness once inside.

45.     Adhering to guidance and standards suggested by data security organizations and federal agencies and following standards mandated by the payment card industry can significantly reduce the likelihood of a data breach.  In fact, one report indicated over 90% of the data breaches occurring in 2014 were preventable.   Instead, susceptibility to a data breach occurs when businesses fail to take adequate and available security measures, leaving their networks without "effective internal data security procedures."  Steven Trader, *Wendy's hit With Shareholder Suit Over Customer Data Breach*, Law360 (Dec. 16, 2016), https://www.law360.com/articles/873987/wendy-s-hit-with-shareholder-suit-over-customer-data-breach.

46.     The PCI SSC created the PCI DSS to "encourage and enhance cardholder data security and facilitate the broad adoption of consistent data security measures."  PCI DSS applies "to all entities that store, process, or transmit cardholder data and/or sensitive authentication data." *See* https://www.pcisecuritystandards.org/documents/PCI_DSS_v3-2-1.pdf?agreement=true&time=1543875542181 at 7 (last accessed Dec. 3, 2018).   PCI DSS comprises "a minimum set of requirements for protecting data."  *Id*. at 5.

47.     PCI DSS 3.2, the version of the standards in effect for the majority of time after Marriott's Starwood acquisition, sets forth comprehensive and detailed requirements that must be followed to meet each of the following twelve "high-level" mandates:

| PCI Data Security Standard – High Level Overview | | |
|---|---|---|
| Build and Maintain a Secure Network and Systems | 1. | Install and maintain a firewall configuration to protect cardholder data |
| | 2. | Do not use vendor-supplied defaults for system passwords and other security parameters |
| Protect Cardholder Data | 3. | Protect stored cardholder data |
| | 4. | Encrypt transmission of cardholder data across open, public networks |
| Maintain a Vulnerability Management Program | 5. | Protect all systems against malware and regularly update anti-virus software or programs |
| | 6. | Develop and maintain secure systems and applications |
| Implement Strong Access Control Measures | 7. | Restrict access to cardholder data by business need to know |
| | 8. | Identify and authenticate access to system components |
| | 9. | Restrict physical access to cardholder data |
| Regularly Monitor and Test Networks | 10. | Track and monitor all access to network resources and cardholder data |
| | 11. | Regularly test security systems and processes |
| Maintain an Information Security Policy | 12. | Maintain a policy that addresses information security for all personnel |

48.     Among other things, PCI DSS 3.2 required Marriott to: install and maintain a firewall configuration to protect cardholder data, adequately protect stored cardholder data, protect all systems against malware and regularly update antivirus software or programs, develop and maintain secure systems and applications, restrict access to cardholder data by business need to know, and track and monitor all access to network resources and cardholder data.

49.     Federal and State governments have similarly sought to introduce security standards and recommendations to temper data breaches and the resulting harm to consumers and financial institutions.   The FTC has issued numerous guides for businesses highlighting the importance of reasonable data security practices. The FTC notes the need to factor security into all business decision-making. *See Federal Trade Comm'n, Start With Security A Guide For Business, Lessons Learned from FTC Cases* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.  Data security requires encrypting information stored on computer networks; holding on to information only as long as necessary; properly disposing of personal information that is no longer needed; limiting administrative access to business systems; using industry-tested and accepted security methods; monitoring activity on your network to uncover unapproved activity; verifying that privacy and security features work; testing for common vulnerabilities; and updating and patching third-party software.  *See id.; Federal Trade*

Comm'n, *Protecting Personal Information, A Guide For Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

50.     The FTC has taken an active approach in issuing orders against businesses for failing to adequately and reasonably protect customer data.  The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.

51.     States have also adopted unfair and deceptive trade practices acts, which prohibit unfair trade practices, including the failure to employ reasonable security processes to protect payment card data.  Most states have also enacted statutes requiring merchants to provide notice to consumers of security systems breaches.  These statutes, explicitly or implicitly, mandate the use of reasonable data security practices and reflect the public policy of protecting sensitive customer data.

52.     Marriott was at all times fully aware of its data protection obligations.  Marriott was also aware of the significant repercussions of a data breach because of the numerous highly-publicized ones that came before it.  Marriott also knew that PCI DSS compliance is required, and even became a "Participating Organization" within PCI SSC.  *See* https://www.pcisecuritystandards.org/get_involved/participating_organizations?category=&region=&alphaFilter=m#filterForm (last accessed Dec. 4, 2018).  Marriott knew that because it used and stored payment card data, financial institutions, including Plaintiff and the Class, were entitled to and in fact relied upon Marriott to keep sensitive financial information secure from hackers.

53.     Marriott failed to employ reasonable security measures to avoid, detect, and/or minimize the impact of the Marriott Data Breach.  Upon information and belief, this includes failure to comply with PCI DSS requirements; failure to take additional, reasonable protective measures beyond PCI DSS; operating the Starwood Database with insufficient security in place; and failure to take reasonable and necessary protective measures on its administrative network.

54.     Marriott tacitly recognizes that its current network security is woefully deficient. On Marriott's Starwood Guest Reservation Database Security Incident webpage, Marriot states it "is also devoting the resources necessary to phase out Starwood systems and accelerate the ongoing security enhancements to our network."  https://answers.kroll.com/ (last accessed Dec. 10, 2018).

**Marriott Knew the Starwood Database was Vulnerable to Cyberattacks**

55.     Even before the acquisition of Starwood Hotels was complete, Marriott was well aware that Starwood Hotels was a target of cyberattacks.  Nevertheless, it refused to implement best practices relating to data security.

56.     In November 2015, Starwood Hotels warned of a credit card data breach that primarily impacted the United States and Canada at mostly Sheraton and Westin locations, just days after Marriott and Starwood announced the acquisition would take place.  *See* https://krebsonsecurity.com/2015/11/starwood-hotels-warns-of-credit-card-breach/ (last accessed Nov. 30, 2018).

57.     Starwood did not confirm when the earlier breach began, but stated it stretched back at least one year to November 2014.

58.     Given the condition of Starwood's security and software management and the knowledge of a prior data breach, Marriott should have known that its Starwood Database was

vulnerable to cyberattacks.  Nevertheless, Marriott failed to uncover the present data breach, either when acquiring Starwood, or in the years following the acquisition.

### Marriott Failed to Investigate or Address Starwood's Cybersecurity

59.     During and after the acquisition, Marriott failed to investigate or upgrade Starwood's cybersecurity.  First, Marriott had actual notice that Starwood had suffered a data breach just days after announcing that the company would be acquired.  Second, Marriott was aware of the consequences of such a breach after having witnessed numerous other breaches around the country.  Third, Marriott had access to information from data security experts, the FTC, and the payment card industry necessary to protect personal and financial information.  Fourth, Marriott had access to, and was a Participating Member of, PCI SSC.

60.     Marriott had every opportunity to secure customers' personal and financial data. Initially, Marriott had at least nine months from the time the Starwood acquisition was announced to the closing of the deal to conduct adequate due diligence on Starwood's cybersecurity.  It also had an additional two years to conduct a cybersecurity assessment of its newly-acquired subsidiary and to make any necessary updates were it inclined to do so post-acquisition.

61.     Despite these resources and opportunities available to Marriott, it failed to take reasonable and sufficient action to prevent and detect a breach of the Starwood Database.  Had Marriott conducted adequate due diligence, followed PCI DSS guidelines, and adopted security measures recommended by experts in the field, Marriott could have prevented or mitigated the theft of many of its customers' financial information.

62.     Because Marriott failed to take reasonable protective measures to identify and stymie the data breach, Plaintiff and the Class have been required to bear the costs of reissuing affected cards compromised in the Marriott Data Breach, among other damages.

## The Fallout from Marriott's Data Breach

63.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.  As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."  Report to Congressional Requesters, Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007) at 29, http://www.gao.gov/new.items/d07737.pdf (last accessed Nov. 30, 2018).

64.     Personal Information such as that stolen in the Marriott Data Breach is highly coveted by, and a frequent target of, hackers.  Thieves use credit card information to create fake credit cards that can be swiped as if they were real credit cards; can use a victim's Personal Information to commit immigration fraud, obtain a driver's license or identification card in the victim's name but with another's picture, use the victim's information to obtain government benefits, file a fraudulent tax return using the victim's information to obtain a fraudulent refund; or get medical services using consumers' stolen information or commit any number of other frauds, such as obtaining a job, procuring housing, or even giving false information to police during an arrest.

65.     A cyber black market exists where criminals openly post and sell stolen credit card numbers, Social Security numbers, and other Personal Information on a number of Internet websites.

66.     Given the financial damage that data breaches can inflict, financial institutions must take swift action when consumer financial card data is compromised in a data breach.   This includes contacting affected customers, refunding fraudulent transactions, and reissuing affected cards.   This is in addition to the substantial disruption to Plaintiff's business operations as a result of the breach, requiring personnel to investigate, respond, and reach out to members regarding the alerted-on accounts.

67.     On December 7, 2018, Plaintiff was notified by Visa's CAMS alerts that cards it issued may have been compromised by the Marriott Data Breach.

68.     When card issuing financial institutions receive a CAMS or similar alert related to a data breach, regulatory, financial, and customer relationship considerations require the institutions to act by increasing fraud monitoring, replacing cards, or otherwise mobilizing to address the breach.   This mandatory response inflicts substantial costs upon affected financial institutions.

69.     As a result of the Marriott Data Breach, Plaintiff and the Class were required to act immediately to mitigate damage by replacing payment cards with compromised card data.

70.     Marriott's actions and failures to act have caused Plaintiffs and the Class to suffer harm and/or face the significant and imminent risk of future harm, including:

        a.   bearing the costs of canceling or reissuing any credit and debit cards affected by the Marriott Data Breach;

        b.   closing deposit, transaction, checking, or other accounts affected by the Marriott Data Breach, including, but not limited to, stopping payments or blocking transactions with respect to the accounts;

    c.   opening or reopening any deposit, transaction, checking, or other accounts affected by the Marriott Data Breach;

    d.   refunding or crediting any cardholder to cover the cost of any unauthorized transaction relating to the Marriott Data Breach;

    e.   responding to a higher volume of cardholder complaints, confusion, and concern; and

    f.   increasing fraud monitoring efforts.

71.    The challenges and expenses that Plaintiff has already experienced and will continue to experience are shared by each member of the Class.  Financial institutions and card issuers throughout the country will be forced to shoulder the burden of the Marriott Data Breach in the form of fraud monitoring, canceling compromised cards, and refunding fraudulent activity, among other things.

72.    Plaintiff and the Class have suffered damages that will continue to increase in order to remedy the consequences of the Marriot Data Breach.

## CLASS ACTION ALLEGATIONS

73.    Pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3), and, as applicable, (c)(4), Plaintiff seeks certification of the following Nationwide Class (the "Nationwide Class" or the "Class"):

All banks, credit unions, financial institutions, and other entities in the United States (including its Territories and the District of Columbia) that issued payment cards (including debit or credit cards) that were used by consumers to make reservations with or purchases from Defendant from 2014 to 2018.

74.    Excluded from the Class is Defendant and its subsidiaries and affiliates, all employees of Defendant, any entity in which Defendant have a controlling interest, and Defendant's officers, directors, legal representative, successors, subsidiaries, and assigns.  Also

17

excluded from the Nationwide Class are any judicial officers presiding over this matter, members of their immediate family, and members of their judicial staff.

75.     Plaintiff reserves the right to modify, expand or amend the above class definition or to seek certification of a class or subclass defined differently than above before any court determines whether certification is appropriate following discovery.

76.     **Numerosity:** The members of each Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  Plaintiff believes that there are thousands of members of the Class.  Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

77.     **Commonality and Predominance:** Consistent with Fed. R. Civ. P. 23(a)(2) and (b)(3)'s predominance requirement, this action involves common questions of law and fact which predominate over any questions affecting only individual Class members, including, but not limited to:

> a.   Whether Marriott knew or should have known of the susceptibility of the Starwood Database to a data breach;
>
> b.   Whether Marriott's security measures to protect the Starwood Database were reasonable;
>
> c.   Whether Marriott failed to comply with applicable security standards;
>
> d.   Whether Marriott's failure to implement reasonable data security measures allowed the breach of the Starwood Database to occur or continue for four years;

e.  Whether reasonable security measures known and recommended by the data security community could have reasonably prevented the breach of the Starwood Database;

f.  Whether reasonable measures to monitor and detect unauthorized activity known and recommended by the data security community could have minimized the extent and duration of the data breach; and

g.  Whether Plaintiffs and the Class were injured and suffered damages or other losses as a result of Marriott's actions, failures, or failures to act.

78.  **Typicality**: Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff if a typical member of the Class.  Plaintiff is a bank who issued payment cards compromised by the infiltration and theft of card payment information from the Starwood Database.  Plaintiff's claims are typical of other Class members' claims because the Plaintiff and Class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

79.  **Adequacy of representation**: Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff is an adequate class representative because its interests do not conflict with the interests of Class members who it seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation and data breach litigation, and Plaintiff intends to prosecute this action vigorously.  The Class members' interests will be fairly and adequately protected by Plaintiff and its counsel.

80.  **Superiority:** Consistent with Fed. R. Civ. P 23(b)(3), a class action is superior to all other available methods for fairly and efficiently adjudicating the claims of Plaintiff and the Class members.  Plaintiff and the Class members have been harmed by Defendant's wrongful

actions and inaction.  Litigating this case as a class action will reduce the possibility of repetitious litigation relating to Defendant's wrongful actions and inaction.

81.     A class action is an appropriate method for the fair and efficient adjudication of this controversy.  There is no special interest in the members of the Class individually controlling the prosecution of separate actions.  The loss of money and other harm sustained by many individual Class members will not be large enough to justify individual actions, especially in proportion to the significant costs and expenses necessary to prosecute this action.  Class treatment will permit a large number of similarly situated institutions to prosecute their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would entail.  No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.  Furthermore, Defendant transacts substantial business in and perpetuated its unlawful conduct from Maryland.  Defendant will not be prejudiced or inconvenienced by the maintenance of this class action in this forum.

82.     **Declaratory and Injunctive Relief:** Consistent with Fed. R. Civ. P. 23(b)(2), Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

## CLAIMS FOR RELIEF

## COUNT 1

### NEGLIGENCE

83.     Plaintiff repeats and realleges all foregoing paragraphs as if fully alleged herein.

84.     Defendant owed an independent duty to Plaintiff and Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the

payment card information in its possession from being compromised, lost, stolen, accessed and misused by unauthorized persons. More specifically, this duty included, among other things:

    a. designing, maintaining, and testing security systems to ensure that Plaintiff's and Class members' Financial Information in Defendant's possession was reasonably secured and protected;

    b. implementing processes that would detect a breach of its security system in a timely manner;

    c. timely acting upon warnings and alerts regarding unauthorized access, including those generated by Marriott's own security systems; and

    d. maintaining reasonable data security software, hardware, employees, and policies.

85.    Defendant's duty to use reasonable care arose from several sources, including, but not limited to, those described below.

86.    Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class members were the foreseeable and probable victims of any inadequate data security practices with respect to payment card information. It was both foreseeable and likely that Plaintiff and Class Members would be harmed by any failure to reasonably protect their payment card information.

87.    Defendant's duty also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect Personal Information by companies such as Defendant. Various FTC

publications and data security breach orders further form the basis of Defendant's duty.   In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

88.     Defendant was also obligated to perform its business operations in accordance with industry standards, including PCI DSS.   These industry standards create yet another source of obligations that mandate Marriott to exercise reasonable care with respect to Plaintiff and the Class.

89.     Defendant also had a duty to safeguard Plaintiff and the Class's sensitive financial information and to promptly notify them of a breach because of state laws and statutes that require Defendant to reasonably safeguard sensitive information.

90.     Defendant admits that it has a responsibility to protect consumer data, that it is entrusted with this data, and that it did not live up to its responsibility to protect the Personal Information at issue here.   Specifically, Defendant failed to act reasonably in protecting the cardholder data of Plaintiff and the Class members, and did not have reasonably adequate systems, procedures and personnel in place to prevent the disclosure of theft of the cardholder data of Plaintiff and the Class.

91.     Defendant had the opportunity and resources to detect and prevent the Marriott Data Breach.  Defendant knew during its acquisition of Starwood that Starwood had been a target of hackers in the past, and had years to detect and remediate the Data Breach.

92.     Timely notification was required, appropriate and necessary so that, among other things, Plaintiff and Class members could timely and appropriately respond, and take the steps necessary to protect themselves from unnecessary damages.

93.     Defendant breached the duties it owed to Plaintiff and Class members described above and thus was negligent.  Defendant breached these duties by, among other things, failing to:

a.   exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the Personal Information of Plaintiff and Class members on its Starwood reservation systems;

b.   detect the breach while it was ongoing *for four years*;

c.   maintain security systems consistent with industry standards; and

d.   disclose that Plaintiff's and the Class members' payment card information in Defendant's possession had been or was reasonably believed to have been, stolen or compromised.

94.     But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class members, their financial information would not have been compromised.

95.     As a direct and proximate result of Defendant's negligence, Plaintiff and the Class members have been injured as described herein, and are entitled to damages in an amount to be proven at trial.

## COUNT 2

## NEGLIGENCE *PER SE*

96.     Plaintiff repeats and realleges all foregoing paragraphs as if fully alleged herein.

97.     Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the Federal Trade Commission ("FTC"), the unfair act or practice by companies such as Defendant of failing to use reasonable measures to protect Personal Information.  Various FTC publications and orders also form the basis of Defendant's duty.

98.     Defendant violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect cardholder data and by not complying with applicable

industry standards, including PCI DSS as described herein.  Defendant's conduct was particularly unreasonable given the nature and amount of cardholder data it maintained in the Starwood Database and the foreseeable consequences of a data breach at a national hotel chain, including, specifically, the immense damages that would result to financial institutions like Plaintiff and the Class.

99.     Defendant's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence *per se*.

100.     Plaintiff and the Class are within the class of persons Section 5 of the FTC Act (and similar state statutes) was intended to protect because they are engaged in trade and commerce and bear primary responsibility for reimbursing consumers for fraud losses.

101.     Additionally, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against.  The FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and the Class.

102.     As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class members have been injured as described herein, and are entitled to damages in an amount to be proven at trial.

## COUNT 3

### DECLARATORY AND INJUNCTIVE RELIEF

103.     Plaintiff repeats and realleges all foregoing paragraphs as if fully alleged herein.

104.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the right and legal relations of the parties and grant further

24

necessary relief. This Court also has broad authority to restrain acts, such as here, that are tortious and violate the terms of federal and state statutes described herein.

105. An actual controversy has arisen in the wake of the Marriott Data Breach regarding Defendant's common law and other duties to act reasonably with respect to safeguarding the cardholder data of the members of Plaintiff and the Class. Plaintiff alleges Marriott's actions (and inactions) in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiff continues to suffer injury as additional fraud and other illegal charges are made upon payments cards Plaintiff and the Class members have issued.

106. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

> a. Defendant owes a legal duty to secure the personal and financial information with which it is entrusted – specifically including information pertaining to credit and debit cards entrusted to its protection– and to immediately notify financial institutions of a data breach under the common law, Section 5 of the FTCA, Card Operating Regulations, PCI DSS standards, and various state statutes of the precise scope of payment cards at risk and the reasons therefor;
>
> b. Marriott breached and continues to breach these legal duties by failing to employ reasonable measures to secure its customers' personal and financial information; and
>
> c. Marriott's ongoing breaches of its legal duty caused and to continue to cause Plaintiff and the Class harm.

107.     The Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect consumers' Personal Information.

108.     If an injunction is not issued, Plaintiff will suffer irreparable injury.  The risk of another such breach is real, immediate, and substantial.  If another breach of Defendant's databases occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and it will be forced to bring multiple lawsuits to rectify the same conduct.

109.     The hardship to Plaintiff if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued.  Among other things, if another massive data breach occurs at Marriott, Plaintiff and the thousands of putative Class members will likely be subjected to substantial financial damage.  On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

110.     Issuance of the requested injunction will not disserve the public interest.  To the contrary, such an injunction would benefit the public by preventing another data breach at Marriott, thus eliminating the additional injuries that would result to Plaintiff and the millions of consumers whose confidential information would be further compromised.

## REQUEST FOR RELIEF

Plaintiff, individually and on behalf of members of the Class respectfully requests:

1.     That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; appoint Plaintiff as class representative; and appoint Plaintiff's counsel as Class Counsel;

2.      That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

3.      That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of their unlawful acts, omissions, and practices;

4.      That the Court award Plaintiff and Class members damages in an amount to be determined at trial;

5.      That Plaintiff be granted the declaratory relief sought herein;

6.      That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses to the extent allowed by law;

7.      That the Court award pre- and post-judgment interest at the maximum legal rate; and

8.      That the Court grants all such other relief as it deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a jury trial on all issues so triable.


DATED:  December 12, 2018                SILVERMAN THOMPSON SLUTKIN
                                          & WHITE LLC


                                         _____/s/_Steven D. Silverman_____
                                         STEVEN D. SILVERMAN (Bar No. 22887)
                                         ssilverman@mdattorney.com
                                         JOSEPH F. MURPHY, JR. (Bar No. 00659)
                                         jmurphy@mdattorney.com
                                         ANDREW C. WHITE (Bar No. 08821)
                                         awhite@mdattorney.com
                                         WILLIAM N. SINCLAIR (Bar No. 28833)
                                         bsinclair@mdattorney.com

201 N. Charles Street, 26th Floor
Baltimore, Maryland 21201
Telephone: (410) 385-2225
Facsimile:  (410) 547-2432

ZIMMERMAN REED LLP

BRIAN C. GUDMUNDSON
(*Pro Hac Vice* Pending)
brian.gudmunson@zimmreed.com
BRYCE D. RIDDLE
(*Pro Hac Vice* Pending)
bryce.riddle@zimmreed.com
1100 IDS Center
80 South 8th Street
Minneapolis, MN  55402
Telephone:  (612) 341-0400
Facsimile:   (612) 341-0844

MURRAY LAW FIRM

ARTHUR M. MURRAY
(*Pro Hac Vice Pending*)
amurray@murray-lawfirm.com
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 525-8100
Facsimile:  (504) 584-5249

BERMAN FINK VAN HORN P.C.

CHARLES H. VAN HORN
(*Pro Hac Vice* Pending)
cvanhorn@bfvlaw.com
KATHERINE M. SILVERMAN
(*Pro Hac Vice* Pending)
ksilverman@bfvlaw.com
3475 Piedmont Road, NE Suite 1100
Atlanta, GA  30305
Telephone:  (404) 261-7711


*Attorneys for Plaintiffs and the Classes*